UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ACCOUNTS 100006460808614 AND 100019148018173 WHICH ARE STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | Case No. 3:17mj 1754(JGM) **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

I, Ryan Mahar, being duly sworn, depose and state as follows:

**BACKGROUND OF AFFIANT**

1.      I am a Special Agent with Homeland Security Investigations ("HSI"), and I have been employed by HSI as a Special Agent since July 2011.  Prior to serving as a Special Agent with HSI, I was employed as a Special Agent with the United States Secret Service ("USSS") for approximately nine years.  I am presently assigned to the HSI office in Hartford, Connecticut.  I have received extensive training provided by the Federal Law Enforcement Training Center, the USSS, and HSI in the investigation and enforcement of laws of the United States.  I have received training in the area of child pornography (as defined in 18 U.S.C. § 2256) and child exploitation, and have, as part of my daily duties as an HSI agent, investigated violations relating to child exploitation and child pornography, including violations pertaining to the possession, distribution, receipt and production of child pornography, the online enticement of minors, and the traveling in interstate and foreign commerce to engage in sexual activity with minors, in violation of 18 U.S.C. §§ 2251, 2252, 2252A, 2422, and 2423.  I have participated in the execution of numerous search and arrest warrants involving child exploitation and/or child pornography offenses.  I also serve as a computer forensic examiner with HSI.



2.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent authorized to enforce criminal laws and duly authorized by the Attorney General to request a search warrant.  I am one of the officers involved in the investigation that is the subject of this affidavit and have personally participated in the investigation concerning the violations of the federal laws listed herein.

3.      I am currently investigating Derek BALDWIN ("BALDWIN"), an adult male born in 1985, who at the time of the offense conduct under investigation was residing in the area of Roseville, Ohio, for knowingly conspiring to distribute and aiding and abetting the distribution of child pornography and visual depictions of a minor engaged in sexually explicit conduct, in violation of 18 U.S.C. §§ 2252A and 2 (hereinafter the "**TARGET OFFENSES**").

4.      I subscribe this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the Government copies of the information (including content of communications) further described in Section I of Attachment B, which information is associated with Facebook accounts 100006460808614 in the name of Derek BALDWIN (hereinafter "**TARGET FACEBOOK ACCOUNT #1**") and 100019148018173 in the name of Zach ZXZ (hereinafter "**TARGET FACEBOOK ACCOUNT #2**"), and are further described in Attachment A.  The information sought is stored at premises owned, maintained, controlled, or operated by Facebook, Inc., an online social networking service headquartered, and which accepts service of legal process, at 1601 Willow Road, Menlo Park, California 94025  (hereinafter "Facebook" or "the Provider").  Upon receipt of the information described in Section I of Attachment B, government-authorized personnel will review that information to locate the items described in Section II of Attachment B. Attachments A and B are incorporated herein by reference.

2

5.    On October 27, 2017, a preservation letter was sent to Facebook requesting the preservation of **TARGET FACEBOOK ACCOUNT #1** and **TARGET FACEBOOK ACCOUNT #2**.

6.    Based on the information set forth in this Affidavit, I believe there is probable cause to believe that **TARGET FACEBOOK ACCOUNT #1** and **TARGET FACEBOOK ACCOUNT #2** constitute and contain items that constitute instrumentalities, fruits, and evidence of the **TARGET OFFENSES**, as more fully specified in Section II of Attachment B.

7.    The statements contained in this Affidavit are based in part on information provided by other members of local, state, and federal law enforcement,  my own investigation to include personal observations, documents and other investigative materials which I have reviewed, as well my training and experience as a Special Agent with HSI.   Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the **TARGET OFFENSES** are located within **TARGET FACEBOOK ACCOUNT #1** and **TARGET FACEBOOK ACCOUNT #2**, as more fully described in Attachment A.

## JURISDICTION

8.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711(3). *See* 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

RM

9.      Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## STATUTORY AUTHORITY

10.      This investigation concerns possible violations of 18 U.S.C. §§ 2252A relating to child pornography and the sexual exploitation of minors.

11.      18 U.S.C. § 2252A prohibits a person from knowingly mailing, transporting, shipping, receiving, distributing, reproducing for distribution, selling, accessing with intent to view or possessing any child pornography, as defined in 18 U.S.C. § 2256(8), when such child pornography was either mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer, or when such child pornography was produced using materials that had traveled in interstate or foreign commerce.   The statute also prohibits a person from attempting and conspiring to do the same.

## DEFINITIONS

12.      The following definitions apply to this Affidavit:

a.      "Child Pornography," as used herein, includes the definition in 18 U.S.C. § 2256(8) (any visual depiction including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means of sexually explicit conduct, where (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; (B) such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), and also includes any visual depiction, the production of which involves the use of a minor engaged

4

in sexually explicit conduct. 18 U.S.C. §§ 2252 and 2256(2).

        b.     "Visual depiction" includes undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format. 18 U.S.C. § 2256(5).

        c.     "Sexually explicit conduct" means actual or simulated (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person. 18 U.S.C. § 2256(2)(A).

        d.     "Minor" means any person under the age of 18 years. 18 U.S.C. § 2256(1).

        e.     "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. Traditionally, IP addresses were either dynamic, meaning an Internet service provider ("ISP") assigns a different unique number to a computer every time it accesses the Internet, or static, meaning an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. Generally, the static IP addresses were assigned by those companies who offered "broadband" Internet service, such as through cable or digital subscriber line ("DSL"), whereas "dial-up" companies would assign their users dynamic addresses. Now, however, as a greater number of American Internet users choose broadband Internet service, many of these users are being assigned what may be colloquially referred to as a "sticky dynamic IP address" or a "sticky IP." A sticky IP is a dynamically assigned IP address that does not change often. The address leases are usually set to long periods and simply renewed upon expiration. The practical effect is that one may observe a user being assigned the same IP

address for weeks or months and then assigned another IP address for a similar stretch of time.

## BACKGROUND ON FACEBOOK

13.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

14.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number ("UID") to each account.

15.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

16.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook

RM

users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

17.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

18.     Facebook allows users to upload photos and videos. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

19.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.

Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

20. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

21. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

22. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

23. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

24. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

25.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.  Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

26.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

27.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

28.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

29.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile,

that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

30.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).   In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.   Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

31.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## BACKGROUND ON KIK MESSENGER

32.     Kik Messenger ("Kik"), is a free instant messaging mobile app from the Canadian company Kik Interactive, available free of charge on iOS, Android, and Windows Phone operating systems.   Kik uses cellular data or Wi-Fi to transmit and receive messages, photos, videos, sketches, mobile webpages, and other content after users register a username.   Kik is primarily a social media mobile device application designed for mobile messaging and communication. To use this application, a user downloads the application via a service such as the Google Play Store, Apple iTunes, or another similar provider.

33.     Once the application is downloaded and installed, the user is prompted to create an account by providing a first name, a last name, an email address and a username.  The first and last name are submitted by the user and are not verified by Kik, and may or may not be the user's real name.  Kik attempts to verify the email address provided by the user by sending an email message containing a verification link.  Kik allows new accounts to operate without verifying the account but Kik is able to identify which email addresses have been verified and which have not. The user creates his/her own username which must be unique and therefore not already in use. The username is also known as the "screen name" or "display name" and it is the name that the other Kik users see when transmitting messages back and forth.

34.     Once the user has created a Kik account, the user is able to locate other users via a search feature, and the two parties can then send messages, images, and videos between them. Users are also able to create chat groups of up to 50 people, to communicate in a group setting and exchange images and videos. These groups are administered by the creator who has the authority to ban and remove other users from the created group.  Once the group is created, users have the option of sharing a link to the group with all of their contacts or any other user.  These groups are frequently created with a name or a "hashtag" that is easily identifiable or searchable by keyword.

35.     Based on my training and experience, I know that Kik users who are interested in trading child pornography try to monitor who is admitted into their groups by requiring either someone to vouch for you before being admitted or to require you to provide child pornography before being admitted to ensure you are not an undercover law enforcement officer.  I also know that individuals in these chat groups are frequently banned or removed for their failure to post child pornography material within a specific period of time determined by the group administrator.  The groups are also used as meeting grounds for users with common interests to acquaint themselves

11

and then leave the group to communicate via direct one-to-one messaging. Some Kik users also provide links or password access to larger quantities of child pornography that are stored in a cloud-based storage service.

## CHILD PORNOGRAPHY PRODUCER AND COLLECTOR CHARACTERISTICS

36.     Based upon my training and experience, as well as from information provided to me by other law enforcement personnel involved in the investigation of cases involving the sexual exploitation of children, I believe the following traits and characteristics are generally found to exist and be true in cases involving individuals who produce, distribute, and/or collect child pornography:

a.     The majority of individuals who produce, distribute, and/or collect child pornography are persons who have a sexual attraction to children.   They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

b.     The majority of individuals who produce, distribute, and/or collect child pornography produce, distribute, and/or collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification.   The majority of these individuals also collect child erotica, which may consist of images or text that do not rise to the level of child pornography but which nonetheless fuel their deviant sexual fantasies involving children.

c.     The majority of individuals who produce, distribute, and/or collect child pornography often seek out like-minded individuals, either in person or over the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support.   The different Internet based vehicles used by such

individuals to communicate with each other include, but are not limited to: P2P, e-mail, e-mail groups, bulletin boards, Internet Relay Chat ("IRC"), newsgroups, instant messaging, and other similar vehicles.

        d.     The majority of individuals who produce, distribute, and/or collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials.  They almost always maintain their collections in private and secure locations such as their homes or on electronic storage devices.

## BACKGROUND OF THE INVESTIGATION

37.    On or about July 26, 2017, I, along with members of HSI Hartford and other law enforcement officers, executed a federal search warrant at a residence in Manchester, CT for child pornography related violations.  The occupants of the residence were interviewed regarding their knowledge of the illegal activity after being provided with Miranda Warnings.  One of the occupants of the residence confessed to operating the online account that he/she used to traffick in child pornography.  This subject then provided consent for law enforcement to access and assume his/her online identities.  One of the accounts operated online by the subject was a Kik Messenger account with membership in the Kik Messenger group "Gay Boy Sl@ves", which is also known as #boyservants.  I then began monitoring this Kik Messenger group at the end of July 2017.

## PROBABLE CAUSE

38.    On or about August 4, 2017, acting in an undercover capacity, I accessed the Kik Messenger group "Gay Boy Sl@ves", which is also known as #boyservants.  I observed six image files posted to the group on or about August 2, 2017 by Kik Messenger user "andre249012", whose display name on Kik is "Luca NEUROSE".  These six image files depict what I believe, based on

13

my training and experience, to be minor males engaging in sexual acts and/or the minor males exposing their genitals.  A review of the members of Kik Messenger group "Gay Boy Sl@ves" revealed there were 50 of 50 possible members in the group and one of the group members was Kik Messenger user "**dilligaf421**" (hereinafter the **"KIK ACCOUNT"**), whose display name on Kik is "@wrkmsgmee ...".

39.     On or about August 7, 2017, acting in an undercover capacity, I accessed the Kik Messenger group "Gay Boy Sl@ves", which is also known as #boyservants.  I observed that on or about August 6, 2017, Kik Messenger user "lksyng", whose display name on Kik is "ya what's up", posted the following question: "Any links to trade Young forced boys".  Continuing on August 6, 2017, Kik user "smurfkiller123", whose display name on Kik is "Bobby DUDUKOVICH", posted a link to a Dropbox account folder titled "CP".  Based on my training and experience, I am aware that the term "CP" is an abbreviation for "child pornography." I am also aware that Dropbox is an online cloud storage service that allows users to store and share files with others. I clicked on the link and was able to access this folder on Dropbox and observed 37 files (13 image files and 24 video files) depicting what I believe, based on my training and experience, to be child pornography.  Kik user "smufkiller123" also was the administrator of the Kik Messenger group "Gay Boy Sl@ves" at the time.

40.     On or about August 16, 2017, acting in an undercover capacity, I accessed the Kik Messenger group "Gay Boy Sl@ves", which is also known as #boyservants.  I observed that on or about August 13, 2017 at 2252 hours EST, the **KIK ACCOUNT** posted the following question: "Any ohio boiz".  Kik Messenger user "PCRSICK", whose Kik display name is "Tyler FORDE", then posted the following message: "wisconsin".  The **KIK ACCOUNT** posted the following questions: "Any pixx I can see lol".  Kik Messenger user "PCRSICK" then posted an image file

showing buttocks of an individual of undetermined age wearing a gray shirt.

41.     On or about August 28, 2017, acting in an undercover capacity, I accessed the Kik Messenger group "Gay Boy Sl@ves", which is also known as #boyservants.  I observed that on or about August 27, 2017 at 0351 hours EST, Kik Messenger user "smurfkiller123" promoted the **KIK ACCOUNT** and also Kik Messenger user "cammeronport", whose display name on Kik is ":lollipop:Lollipop Twinkie:lollipop:" to administrators for Kik Messenger group "Gay Boy Sl@ves".

42.     On or about September 11, 2017, acting in an undercover capacity, I accessed the Kik Messenger group "Gay Boy Sl@ves", which is also known as #boyservants.  I observed that on or about September 1, 2017 at 2016 hours EST, Kik Messenger user "angelboi2" posted the following message: "Anyone want shirtless pix of my lil bro? And some nude 1s I found of him in his phone".  On or about September 1, 2017 at 2323 hours EST, the **KIK ACCOUNT** posted "Sure I do lol".

43.     On or about September 25, 2017, acting in an undercover capacity, I accessed the Kik Messenger group "Gay Boy Sl@ves", which is also known as #boyservants.  I observed that on or about September 18, 2017 at 1105 hours EST, Kik Messenger user "smurfkiller123" posted an image file depicting what I believe, based on my training and experience, to be a minor male showing his genitals and anus.  On or about September 23, 2017at 1916 hours EST, the **KIK ACCOUNT** posted the following question: "Heyy boiz watz upp any1 in ohio by any chance??".  On or about September 24, 2017 at 1748 hours EST, Kik Messenger user "smurfkiller123" posted an image file depicting what I believe, based on my training and experience, to be two minor males engaging in oral sex.

44.     Kik Interactive, Inc. provided records in response to the Department of Homeland

RM

Security Summonses for the **KIK ACCOUNT**. These records revealed that the **KIK ACCOUNT** was registered on February 4, 2013at 0155 hours UTC. During the registration process, the user provided email address dilligaf421.db@gmail.com. Kik Interactive, Inc. advised the email address dilligaf421.db@gmail.com used to register the **KIK ACCOUNT** is unconfirmed, meaning that either the email address is invalid, or the user did not click on a link within a confirmation email sent from Kik to the email account provided to verify his/her email address. Kik Interactive, Inc. also advised the Kik Messenger app associated with this account was last installed on May 7, 2017 at 0536 hours UTC on a Samsung SM-G930VL device.

45.     Kik Interactive, Inc. also provided records showing the **KIK ACCOUNT** was accessed everyday from August 7, 2017 until October 4, 2017, often multiple times a day. For example, the Kik records indicate that on September 22, 2017, there were 436 logins to the **KIK ACCOUNT**.

46.     On or about October 26, 2017, the National Center for Missing and Exploited Children ("NCMEC") submitted CyberTipline Report 25016612, categorized as Online Enticement-PreTravel, and attached four (three unique) image files and information reported to NCMEC by Facebook. The CyberTipline Report advised that on October 1, 2017 beginning at 0707 hours UTC, **TARGET FACEBOOK ACCOUNT #1**, subscribed to Derek BALDWIN (with a date of birth, which is known to me, in the year 1985), sent messages and image files via Facebook to **TARGET FACEBOOK ACCOUNT #2**, subscribed to Zach ZXZ (with a date of birth, which is known to me, in the year 1994, and telephone number xxx-xxx-0946).

47.     The following is the sequence of messages and images between **TARGET FACEBOOK ACCOUNT #1** (i.e. BALDWIN) and **TARGET FACEBOOK ACCOUNT #2**, as detailed in CyberTipline Report 25016612:

a.   (October 1, 2017 at 07:07:02 UTC) **TARGET FACEBOOK ACCOUNT #1**:
He makes me a lil nervius bc he has to snesk out at like 1 or 2 am

b.   (October 1, 2017 at 07:07:53 UTC) **TARGET FACEBOOK ACCOUNT #1**:
The 14 yo

c.   (October 1, 2017 at 07:07:54 UTC) **TARGET FACEBOOK ACCOUNT #2**:
I see well just let me know bc I won't lie I have thought about it plenty of timeS

d.   (October 1, 2017 at 07:08:04 UTC) **TARGET FACEBOOK ACCOUNT #1**:
Uploaded          image          file          named
"p043ywo55yos8wo822140438_2404050219820315_778107320_o.  jpg." I
have reviewed the image, which depicts an erect penis of an unknown male.

e.   (October 1, 2017 at 07:08:13 UTC) **TARGET FACEBOOK ACCOUNT #1**:
Uploaded          image          file          named
"1dl6w4fucy2sc4gk22193045_2404050256486978_914202697_n.   jpg." I
have reviewed the image, which depicts a male, who I believe based on my
training and experience to be approximately 14 years old, standing in front of a
mirror naked with an erect penis.

f.   (October 1, 2017 at 07:08:32 UTC) **TARGET FACEBOOK ACCOUNT #1**:
Upload          image          file          named
"81vl9xeogh44ogsc22155117_2404050339820303_1406385441_n.  jpg." I
have reviewed the image, which depicts a male, who I believe based on my
training and experience to be approximately 18 years old, with red hair standing
in front of a mirror shirtless but wearing pants.

g.   (October 1, 2017 at 07:09:17 UTC) **TARGET FACEBOOK ACCOUNT #1**:

RM

The red head just turned 18 last week idk if he would be down for sure or not lol

h. (October 1, 2017 at 07:10:10 UTC) **TARGET FACEBOOK ACCOUNT #2**: I understand, I won't lie though, I can't do the hair thing, but just let me know I'm down bro

48.    The CyberTipline Report indicates that Facebook reported that Facebook viewed the image files "p043ywo55yos8wo822140438_2404050219820315_778107320_o.jpg." and "1dl6w4fucy2sc4gk22193045_2404050256486978_914202697_n.jpg" prior to making its report to NCMEC.

49.    Facebook provided records in response to the Department of Homeland Security Summons for **TARGET FACEBOOK ACCOUNT #1**.  Facebook advised this account was created on August 1, 2013 and is registered to Derek BALDWIN.

50.    As discussed above, I am aware based on my training and experience that individuals with a sexual interest in children communicate with each other using a variety of communication methods such as P2P, e-mail, chat rooms, bulletin boards, instant messaging, and other social media applications.  I am also aware that due to the physical distance between users of the internet, they would need a reliable electronic method of communication to chat and transfer files, which can easily be accomplished with social media networks.

## CONCLUSION

51.    Based on the aforementioned factual information, there is probable cause to believe, and I do believe, that evidence of the **TARGET OFFENSES** is located within **TARGET FACEBOOK ACCOUNT #1** and **TARGET FACEBOOK ACCOUNT #2**, which constitutes and contains items that constitute contraband, fruits, instrumentalities and evidence of crime, or

material otherwise criminally possessed, or property that is or has been used as the means of committing the **TARGET OFFENSES**.

52.     In consideration of the foregoing, I respectfully request that this Court issue a warrant authorizing the search of **TARGET FACEBOOK ACCOUNT #1** and **TARGET FACEBOOK ACCOUNT #2**, described in Attachment A, for the items more specifically identified in Attachment B.

### Non-Disclosure Order

53.     I respectfully request, pursuant to the preclusion of notice provisions of 18 U.S.C. § 2705(b), that the Provider be ordered not to notify any person (including the subscriber or customer to which the materials relate) of the existence of this affidavit, the application, and the search warrant for an initial period of six months.  I submit that such an order is justified because notification of the existence of this Application and Search Warrant would jeopardize and risk shutting down the ongoing investigation.  Such a disclosure would give the subscriber an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.

### Request for Sealing

I also request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this warrant and application is necessary because the items and information to be seized are relevant to an ongoing criminal investigation.  Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, often by posting them publicly online through the carding forums.  Premature disclosure of the

contents of this affidavit and related documents may have a significant and negative impact on the

continuing investigation and may severely jeopardize its effectiveness.

Special Agent Ryan Mahar
Department of Homeland Security
Homeland Security Investigations


Subscribed and sworn to before me this 14th day of November, 2017.


 /s/ Judge Joan G. Margolis

HON.  JOAN G. MARGOLIS
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc., an online social networking service headquartered, and which accepts service of legal process, at 1601 Willow Road, Menlo Park, California, associated with the following Facebook accounts:

1.    Derek BALDWIN (UID: 100006460808614)
2.    Zach ZXZ (UID: 100019148018173)

RM

## ATTACHMENT B

### Records to be Seized

I.   **Information to be disclosed by the provider listed on the search warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)   All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)   All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)   All photos and videos uploaded or received by that user ID and all photos and videos uploaded by any user that have that user tagged in them including photo and video file EXIF data such as Camera Make/Model and Geo-Location Data;

(d)   All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments;

B-1

gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)    All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)    All "check ins" and other location information;

(g)    All IP logs, including all records of the IP addresses that logged into the account;

(h)    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)    All information about the Facebook pages that the account is or was a "fan" of;

(j)    All past and present lists of friends created by the account;

(k)    All records of Facebook searches performed by the account;

(l)    All information about the user's access and use of Facebook Marketplace;

(m)    The types of service utilized by the user;

(n)    The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)    All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including reports of abuse, contacts with support services, and records of actions taken.

(q)     Vanity URL: The user Facebook URL

(r)     All Machine Cookies meaning, every user that logged into his or her account from the same machine as to the target.


The Provider is also requested to complete a certificate of authenticity for domestic business records that will satisfy Rule 902(11) of the Federal Rules of Evidence.   A form of certificate of authenticity is attached.



## II.  Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of child pornography offenses and sexual exploitation of minors, in violation of 18 U.S.C. §§ 2252A and 2, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) In any format, visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

(b) Any and all notes, documents, records, communications, correspondence, and materials, in any format, pertaining to the distribution of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2);

(c) Any and all names, addresses, contact information or lists of names, addresses or contact information, in any format, of those who may have been contacted for the purpose of distributing child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2);

(d) Any and all notes, documents, records, communications or correspondence, in any format, concerning membership in online groups, clubs, or services that provide or make child pornography accessible to members;

(e) Any and all records, documents, communications, correspondence, invoices and materials, in any format, that concern any accounts with an Internet Service Provider;

(f) Any and all records, documents, communications, correspondence, invoices and materials, in any format, that concern online storage or other remote computer

storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage;

(g) Any and all notes, documents, records, communications, and correspondence, in any format, reflecting personal contact or any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2);

(h) Any and all communications to, from, and/or among the accounts or identifiers listed on Attachment A that contain videos or photos of naked or semi-naked minors and/or adults, or individuals engaged in sexually explicit conduct, as that term is defined in Title 18 United States Code Section 2256(2);

(i) Any and all communications between or among the accounts or identifiers listed on Attachment A of any kind;

(j) Any and all communications to, from, and/or among the accounts or identifiers listed on Attachment A that contain discussions of sexual acts of any kind, and/or discussions involving the photographing or video recording of sexually explicit conduct, as defined in 18 U.S.C. § 2256(2);

(k) Any and all videos and photographs, uploaded to Facebook in any way, of naked or semi-naked minors and/or adults, or individuals engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2), and all information regarding how, when, and where such videos and photographs were uploaded including EXIF data such as Camera Make/Model and Geo-Location data;

(l)  All evidence of connection among the accounts or identifiers listed on Attachment A or between any particular account or identifier listed on Attachment A and any other individual (including other minors);

(m)  All evidence of any of the accounts or identifiers listed on Attachment A using that account to seek out, solicit, share, receive, or send, or attempt to do any of the above, videos or photos of naked or semi-naked minors and/or adults, or sexually explicit conduct, as defined in 18 U.S.C. § 2256(2); and

(n)  Evidence of who used, accessed, owned, controlled, or created the accounts or identifiers listed on Attachment A, including financial records and records that help reveal the whereabouts of such person(s);

(o)  Evidence indicating how and when the account or identifier listed on Attachment A was accessed or used;

(p)  Evidence indicating the account user's or users' state of mind as it relates to the crimes under investigation; and

(q)  Passwords and encryption keys, and other access information that may be necessary to access the account or identifier listed on Attachment A;

### CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by _____, and my official title is _____. I am a custodian of records for _____. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of _____ and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a.   all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b.   such records were kept in the ordinary course of a regularly conducted business activity of _____; and

c.   such records were made by _____ as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____        _____
Date                                                    Signature